1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF OREGON

9                        PORTLAND DIVISION

10

11 TERESA E.A. TEATER,                    )
                                          )
12            Plaintiff,                   )      Case No. 3:05-cv-00604-HU
                                          )
13      vs.                               )      **FINDINGS AND**
                                          )      **RECOMMENDATION**
14 PFIZER, INC., and PARKE-DAVIS,         )
   a DIVISION OF WARNER-LAMBERT           )
15 COMPANY,                               )
                                          )
16            Defendants.                 )
                             _____
17
   Andrew M. Schpak
18 Edwin A. Harnden
   BARRAN LIEBMAN LLP
19 601 SW Second Avenue, Suite 2300
   Portland, OR 97204-3519
20
        Attorneys for Plaintiff
21
   Eric J. Neiman
22 David C. Campbell
   WILLIAMS, KASTNER & GIBBS PLLC
23 888 SW Fifth Avenue, Suite 600
   Portland, OR 97204-2025
24
   Mark S. Cheffo
25 Catherine B. Stevens
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
26 Four Times Square
   New York, NY 10036
27
        Attorneys for Defendants
28

   1 - FINDINGS AND RECOMMENDATIONS

**HUBEL, J.,**

Plaintiff Teresa Teater ("Plaintiff") bring this case against Pfizer, Inc. ("Pfizer") and Warner-Lambert Company ("Warner-Lambert") (collectively, "Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, the Oregon Unlawful Trade Practices Act ("UTPA"), ORS 646.605 to 646.656, and state tort law. This court has federal question jurisdiction over the RICO claim, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367. Federal jurisdiction also exists under 28 U.S.C. § 1332 based on diversity. Now before the court is Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons set forth below, Defendants' motion (Docket No. 47) to dismiss should be GRANTED in part and DENIED in part.

### I.  BACKGROUND

Unless otherwise indicated, the following facts are taken from Plaintiff's Amended Complaint and are accepted as true for purposes of resolving Defendants' motion to dismiss.

This is an action to recover damages for injuries sustained by Plaintiff as a result of Defendants' alleged wrongful conduct in connection with designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling gabapentin, a drug sold by Pfizer under the name Neurontin. According to Plaintiff, Defendants undertook a nationwide effort to unlawfully market Neurontin for off-label uses for which there was little or no scientific evidence of efficacy, such as the treatment

1  of post-traumatic stress disorder, bipolar disorder and/or other
2  anxiety disorders.[1]

3       Pfizer acquired Warner-Lambert and its Parke-Davis division in
4  2000.  Prior to Pfizer's acquisition of Warner-Lambert, Neurontin
5  was marketed and sold by Parke-Davis.  Since 2000, Pfizer has
6  marketed and sold Neurontin, which is approved as adjunctive
7  therapy in the treatment of partial seizures with and without
8  secondary generalization in patients with epilepsy.  In May 2002,
9  Neurontin was also approved for the management of postherpetic
10 neuralgia (pain resulting from shingles or herpes zoster) in
11 adults.

12      At no time prior to Plaintiff being prescribed Neurontin did
13 Defendants receive approval from the Food and Drug Administration
14 ("FDA") for any other use of Neurontin except for the above-
15 described treatment, and the FDA never approved the usage of
16 Neurontin at any dosage for the treatment of PTSD. Yet, Defendants
17 marketed and promoted Neurontin for the treatment of PTSD and
18 encouraged that higher dosages than those tested be prescribed,
19 even though Defendants were aware that there was not adequate
20 evidence establishing that Neurontin was a safe and effective
21 treatment for PTSD.  In fact, Defendants knew or should have known
22 that Neurontin caused many symptoms or related risk factors
23 associated with suicidal behavior by persons suffering from PTSD.

24      In reliance upon Defendants' advertising, marketing and
25 promoting of Neurontin as a safe and effective treatment for PTSD,
26 Plaintiff's physicians prescribed Neurontin to treat her PTSD on or

27 _____

28      [1] These disorders have been collectively referred to as "PTSD"
    by Plaintiff's counsel.

3 - FINDINGS AND RECOMMENDATIONS

1  about September 29, 1999. Plaintiff purchased and consumed
2  Neurontin, as recommended and prescribed by her physician and in
3  the dosages prescribed, in an effort to control the effects of
4  PTSD. However, as a result of consuming Neurontin, Plaintiff
5  suffered various adverse effects, including, but not limited to:
6  depression, insomnia, agitation, hyper-mania, vertigo-like symptoms
7  (including vision and balance problems), pneumonia, dehydration,
8  loss of concentration, obesity, abdominal pains, diarrhea, leg
9  spasms and occasional immobile legs, anxiety attacks, incorrect
10 diagnosis and treatment of bipolar disorder, irritable bowel
11 syndrome, mood swings and hostility, and impulsive and reckless
12 behavior. She also missed her daughter's wedding and attempted to
13 commit suicide on October 19, 2002, and May 5, 2003.

14              *II.  LEGAL STANDARD*

15     A court may dismiss a complaint for failure to state a claim
16 upon which relief can be granted pursuant to Rule 12(b)(6).  In
17 considering a Rule 12(b)(6) motion to dismiss, the court must
18 accept all of the claimant's material factual allegations as true
19 and view all facts in the light most favorable to the claimant.
20 *Reynolds v. Giusto*, No. 08-CV-6261, 2009 WL 2523727, at *1 (D. Or.
21 Aug. 18, 2009).  The Supreme Court addressed the proper pleading
22 standard under Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*, 550
23 U.S. 544 (2007).  *Twombly* established the need to include facts
24 sufficient in the pleadings to give proper notice of the claim and
25 its basis:

26         While a complaint attacked by a Rule 12(b)(6) motion to
           dismiss does not need detailed factual allegations, a
27         plaintiff's obligation to provide the grounds of his
           entitlement to relief requires more than labels and
28

conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* at 555 (brackets omitted).

Since *Twombly*, the Supreme Court has clarified that the pleading standard announced therein is generally applicable to cases governed by the Rules, not only to those cases involving antitrust allegations. *Ashcroft v. Iqbal*, ---U.S.---, 129 S. Ct. 1937, 1949 (2009). The *Iqbal* court explained that *Twombly* was guided by two specific principles. First, although the court must accept as true all facts asserted in a pleading, it need not accept as true any legal conclusion set forth in a pleading. *Id.* Second, the complaint must set forth facts supporting a plausible claim for relief and not merely a possible claim for relief. *Id.* The court instructed that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2nd Cir. 2007)). The court concluded: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

The Ninth Circuit further explained the *Twombly-Iqbal* standard in *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009). The *Moss* court reaffirmed the *Iqbal* holding that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Moss*, 572 F.3d at 969 (quoting *Iqbal*, 129 S. Ct. at 1949).   The court in *Moss* concluded by stating: "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inference from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*, 572 F.3d at 969.

### III.   DISCUSSION

Plaintiff's Amended Complaint, filed on February 15, 2012, sets forth seven causes of action: (1) violations of RICO*;* (2) breach of warranty; (3) strict liability; (4) fraud; (5) violations of the UTPA*;* (6) negligence; and (7) unjust enrichment.[2] Defendants seek dismissal of Plaintiff's Amended Complaint in its entirety.

### A.   RICO Standing

Defendants contend that Plaintiff's RICO claim fails because she has not alleged a cognizable RICO injury, and even if the Court finds that she has, her alleged injury is too remote to establish RICO standing.

The statutory provision that creates a RICO civil action, 18 U.S.C. § 1964(c), permits "[a]ny person injured in his business or property by reason of a violation of" the RICO statute to bring a civil suit for treble damages. In order to demonstrate RICO standing, a plaintiff must allege that it suffered an injury to its "business or property," 18 U.S.C. § 1964(c), as a proximate result

---

[2] Defendants have also argued that Plaintiff impermissibly seeks to enforce the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 76 Stat. 780, 21 U.S.C. § 301 *et seq.*, based on Plaintiff's allegations regarding off-label marketing.  Because Plaintiff concedes that she has not brought FDCA claims against Defendants, I need not address Defendants' arguments regarding the viability of such a claim.

1  of the alleged racketeering activity. *Newcal Indus. v. Ikon Office*
2  *Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (citation omitted).
3  That is to say, RICO standing requires compensable injury *and*
4  proximate cause.[3]  *Id.*

5      The compensable injury prong of the RICO standing requirement
6  is comprised of two elements: (1) the plaintiff must experience
7  harm to a specific business or property interest; and (2) the
8  plaintiff must experience a concrete financial loss. *Pradhan v.*
9  *Citibank, N.A.*, No. 10-cv-03245, 2011 WL 90235, at *5 (N.D. Cal.
10 Jan. 10, 2011).  Injury to business or property, which does not
11 include personal damages, is "a categorical inquiry determined by
12 reference to state law," *e.g.*, "state law must protect the alleged
13 business or property interest." *Id.* (citations omitted).

14     Determining whether the plaintiff's injury was proximately
15 caused by a defendant's alleged RICO violation requires courts to
16 conduct a multi-factor inquiry.[4]  "When a court evaluates a RICO
17 claim for proximate causation, the central question it must ask is
18 whether the alleged violation led directly to [the] plaintiff's

19

20

_____

21     [3] "For all standing questions, the burden of proof is on the
22 plaintiff." *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896
   F.2d 1542, 1554 n.18 (9th Cir. 1990) (citing *Baker v. United*
23 *States*, 722 F.2d 517, 518 (9th Cir. 1983)).

24     [4] The factors considered are: "(1) whether there are more
   direct victims of the alleged wrongful conduct who can be counted
25 on to vindicate the law as private attorneys general; (2) whether
   it will be difficult to ascertain the amount of the plaintiff's
26 damages attributable to defendant's wrongful conduct; and (3)
   whether the courts will have to adopt complicated rules
27 apportioning damages to obviate the risk of multiple recoveries."
   *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d
28 696, 701 (9th Cir. 2001) (quotation and quotation marks omitted).

7 - FINDINGS AND RECOMMENDATIONS

1  injuries." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137,

2  1149 (9th Cir. 2008) (citation omitted).

3      In this case, Plaintiff claims she has demonstrated proof of

4  injury to her business or property that resulted in a concrete

5  financial loss. In support of this proposition, Plaintiff quotes

6  the following excerpt from her Amended Complaint:

>  Plaintiff has been injured in her property by reason of
>  these violations in a numbers of ways to be proven at
>  trial including . . . (e) Neurontin caused side-effects
>  in Plaintiff's behavior that resulted in her being unable
>  to pay the monthly rent for a storage unit that contained
>  tools and equipment related to her business ("Seams U Up"
>  -- specializing in sewing work, drapery work, and set
>  construction work) as well as 450 valuable dolls she
>  planned to use as part of a celebrity doll museum
>  ("U . . . Were My Favorite Star!") -- as a result of
>  being unable to pay the monthly rent for the storage
>  unit, its contents were sold at auction against
>  [Plaintiff]'s will.

14  (Am. Compl. ¶ 139.)  Plaintiff claims Paragraph 139 "clearly

15  alleges injury to both [her] past and then-current business . . .

16  as well as her future business," which is sufficient for RICO

17  standing purposes. (Pl.'s Mem. Opp'n at 3.)  Plaintiff cites no

18  authority, however, for the proposition that such alleged harm

19  constitutes a harm to a specific business or property interest

20  cognizable under state law.

21      Citing *Moore v. Eli Lilly & Co.*, 626 F. Supp. 365 (D. Mass.

22  1986), Defendants argue that monetary damages originating from

23  alleged side effects of prescription medicines are hallmark

24  personal injury damages and are insufficient to state a claim under

25  RICO.  In *Moore*, the husband and wife plaintiffs initiated a

26  products liability action against Eli Lilly and Company to recover

27  for personal injuries allegedly caused by the husband's ingestion

28  of a pharmaceutical drug. *Id.*  Because § 1964(c) only establishes

8 - FINDINGS AND RECOMMENDATIONS

1  rights and remedies for injury to business or property, plaintiffs
2  claimed that the alleged diminution of the husband's estate, and
3  loss consortium allegedly suffered by the wife, were injuries to
4  property.    *Id.* at 366. The *Moore* court concluded that the
5  "[p]laintiff's allegations constitute[d] conventional claims for
6  personal injuries," which was distinct from injury to property
7  under federal and state law.    *Id.*

8      Upon review, I agree with Defendants that Plaintiff's
9  allegations of injury are not cognizable under RICO and should be
10 dismissed on the basis that they stem from alleged personal injury.
11 Plaintiff has only pled injuries that derive from the alleged
12 psychological side effects and/or emotional distress caused by her
13 consumption of Neurontin.   For example, Plaintiff claims to have
14 suffered depression, insomnia, agitation, hyper-mania, loss of
15 concentration, anxiety attacks, mood swings, hostility, and
16 impulsive and reckless behavior as a result of being prescribed
17 Neurontin.   She also says consuming Neurontin caused her to suffer
18 "significant emotional distress damages," thus preventing her from
19 attending her only daughter's wedding. (Am. Compl. ¶ 36.)   The same
20 "side-effects in Plaintiff's behavior . . . resulted in her being
21 unable to pay the monthly rent for [her] storage unit that
22 contained tools and equipments related to her business[.]"  (*Id.* ¶
23 139.)

24     In *Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992), the Seventh
25 Circuit held that the plaintiff failed to alleged a business or
26 property injury within the meaning of RICO § 1964(c) because her
27 loss of earnings, purchase of a security system and employment of
28 a new attorney were "plainly derivatives of her emotional distress-

1  and therefore reflect personal injuries which are not compensable

2  under RICO." *Id.* at 770.[5]  Similarly, in this case, as in *Doe*,

3  Plaintiff's alleged injuries are plainly derivatives of her

4  emotional distress and are not compensable under RICO.

5      Accordingly, Defendants' motion to dismiss should be GRANTED

6  because Plaintiff has failed to satisfy the compensable injury

7  prong of the RICO standing requirement. *See Moore v. Navarro*, No.

8  00-03213, 2004 WL 783104, at *8 (N.D. Cal. Mar. 31, 2004) (granting

9  defendant's motion to dismiss after noting that the plaintiff's

10 RICO claim did "not allege a concrete financial loss, but rather

11 [was] based on [the plaintiff] suffering emotional distress.")

### B.   *Fraud-Based Claims*

13     I turn now to the second issue raised by Defendants' motion to

14 dismiss: Does the Amended Complaint allege fraud-based claims with

15 sufficient particularity to withstand a challenge pursuant to Rule

16 9(b)?

17     Rule 9(b) provides that "[i]n alleging fraud or mistake, a

18 party must state with particularity the circumstances constituting

19 fraud or mistake," while "[m]alice, intent, knowledge, and other

20 conditions of a person's mind may be alleged generally." FED. R.

21 CIV. P. 9(b).  "Rule 9(b) demands that the circumstances

22 constituting the alleged fraud be specific enough to give

23 defendants notice of the particular misconduct . . . so that they

24 can defend against the charge and not just deny that they have done

25 anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124

26 (9th Cir. 2009) (internal quotation marks omitted). "Any averments

27

28     [5] The court notes that *Doe* was favorably cited by the Ninth
   Circuit in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005).

1  which do not meet that standard should be 'disregarded,' or
2  'stripped' from the claim for failure to satisfy Rule 9(b)." *Id.*
3  Accordingly, "[t]o avoid dismissal for inadequacy under Rule 9(b),
4  [the] complaint would need to state the time, place, and specific
5  content of the false representations as well as the identities of
6  the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*,
7  356 F.3d 1058, 1066 (9th Cir. 2004) (internal quotation marks
8  omitted).

9      Because Plaintiff's claims for common law fraud, RICO
10  violations and unjust enrichment are grounded in fraud, the parties
11  agree that Rule 9(b)'s heightened pleading standard applies. *See*
12  *Natomas Gardens Inv. Group LLC v. Sinadinos*, Civ. No. S-08-2308,
13  2009 WL 1363382, at *24 (E.D. Cal. May 12, 2009) (recognizing that,
14  in the Ninth Circuit, Rule 9(b) applies to civil RICO fraud claims
15  and "claims -that although lacking fraud as an element- are
16  'grounded' or 'sound' in fraud.") Plaintiff contends she has pled
17  her fraud-based claims "with particularity" based on the following
18  portions of her Amended Complaint:

19  •   Defendants, through clinical trials and other adverse event
20      reports, learned that there was a serious problem of
21      suicidality associated with Neurontin use and failed to inform
22      doctors, regulatory agencies and the public of this risk.
23      Defendants had the means and the resources to perform their
24      pharmacovigilance duties for the entire time Neurontin has
25      been on the market in the United States. (Am. Compl. ¶ 45.)
26  •   Defendants failed to comply with the FDA post-marketing
27      reporting requirements under 21 C.F.R. § 314.80(c) by, inter
28      alia, failing to report each adverse drug experience

11 - FINDINGS AND RECOMMENDATIONS

concerning Neurontin that is both serious and unexpected, whether foreign or domestic, as soon as possible but in no case later than 15 calendar days after initial receipt of the information by Defendants, failing to promptly investigate all adverse drug experiences concerning Neurontin that are subject of the post-marketing 15-day Alert reports, failing to submit follow-up reports within 15 calendar days of receipt of new information or as requested by FDA, and, if additional information was not obtainable, failing to maintain records of the unsuccessful steps taken to seek additional information. (Am. Compl. ¶ 46.)

• Defendants sponsored a 1998 study, which was scientifically valid, conducted at Harvard Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though Defendants were fully aware of these results from the tests which they sponsored, Defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin. (Am. Compl. ¶ 89.)

• Defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts and/or other adverse effects. (Am. Compl. ¶ 95.)

• Plaintiff justifiably relied upon Defendants' misrepresentations and, accordingly, consumed Neurontin as

12 - FINDINGS AND RECOMMENDATIONS

1    prescribed by her physicians in treatment of PTSD. (Am.
2    Compl. ¶ 106.)

3  •  As detailed above, Defendants' pattern of racketeering
4    activity includes acts indictable as mail fraud under 18
5    U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.
6    Defendants' fraudulent scheme consisted of, inter alia: (a)
7    deliberately misrepresenting the uses for which Neurontin was
8    safe and effective so that Plaintiffs and members of the Class
9    paid for this drug to treat symptoms for which it was not
10   scientifically proven to be safe and effective; (b) providing
11   or publishing or causing to have provided or published
12   presentations and materials containing false and/or misleading
13   information upon which physicians, Plaintiff, and the general
14   public relied when choosing to prescribe or pay for Neurontin;
15   (c) actively concealing, and causing others to conceal,
16   information about the true safety and efficacy of Neurontin to
17   treat conditions for which it had not been approved by the
18   FDA; (d) intentionally misrepresenting and concealing
19   Defendants' role and participation in the creation and
20   sponsorship of a variety of events, articles and publications
21   used to sell Neurontin to off-label markets; and (e)
22   intentionally misrepresenting and concealing the financial
23   ties between Defendants and other participants in the off-
24   label promotion enterprise. (Am. Compl. ¶ 132.)

25   In alternative, Plaintiff's counsel argues that any deficiency
26   under Rule 9(b) should be excused because the factual information
27   at issue is peculiarly within Defendants' knowledge and
28   inaccessible to the claimant until discovery has been completed.

13 - FINDINGS AND RECOMMENDATIONS

1  *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010)
2  (stating that courts will "occasionally" relax Rule 9(b)'s
3  particularity requirement where "plaintiffs cannot be expected to
4  have personal knowledge of the relevant facts.") Notably,
5  Plaintiff's counsel has requested the deposition of a
6  pharmaceutical representative who, on information and belief,
7  called on the clinic at which Plaintiff received treatment and was
8  prescribed Neurontin. However, the deposition of the
9  pharmaceutical representative in question will not take place until
10 after the court rules on Defendants' motion to dismiss.

11     In this case, Plaintiff's allegations of fraud do not meet
12 Rule 9(b)'s heightened pleadings standard, which require "the who,
13 what, when, where, and how of the misconduct charged." *Vess v.*
14 *Ciba-Geiby Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). For
15 example, Plaintiff asserts she "justifiably relied upon Defendant's
16 misrepresentations and, accordingly, consumed Neurontin as
17 prescribed by her physicians in the treatment of PTSD," but
18 Plaintiff fails to mention any pharmaceutical representative that
19 called her clinic or when this allegedly took place. Accordingly,
20 Plaintiff's allegations are insufficient to meet the pleading
21 standards for fraud-based claims. *See Cafasso ex rel. United*
22 *States v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1055 (9th
23 Cir. 2011) (noting that fraud claims, "in addition to pleading with
24 particularity, also must plead plausible allegations"); *Bank of New*
25 *York Mellon v. Sakala*, No. 11-cv-00618, 2012 WL 1424665, at *9 (D.
26 Haw. Apr. 24, 2012) (dismissing fraud claim as insufficient under
27 *Iqbal* because it was not alleged "who made the purportedly false
28 statements, where they were made, or when they were made.")

14 - FINDINGS AND RECOMMENDATIONS

### C.  Causation

According to Defendants, each of Plaintiff's claims requires an allegation of causation, but in Defendant's view Plaintiff's Amended Complaint fails to sufficiently plead causation because it fails to draw any connection between the generalized allegations regarding Defendants' alleged wrongful conduct and Plaintiff's alleged injuries.

Plaintiff concedes that her claims require an allegation of causation, but nevertheless argues that her Amended Complaint adequately pleads such a connection.  In support of her position, Plaintiff cites the following paragraphs from her Amended Complaint:

- Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of PTSD and encouraged higher dosages than those tested be prescribed, even though Defendants knew or should have known that there was not adequate tests and studies establishing and confirming that Neurontin was safe and effective treatment of PTSD.  (Am. Compl. ¶ 20.)

- Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon Defendants' misrepresentations in prescribing Neurontin for human consumption in general for treatment of illnesses and medical and mental conditions and that the public, including person such as Plaintiff, would justifiably rely upon Defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers, and mental

15 - FINDINGS AND RECOMMENDATIONS

health care providers in the treatment of PTSD and for other prescribed uses. (Am. Compl. ¶ 105.)

• In reliance upon Defendants' direct and indirect advertising, marketing, and promoting of Neurontin as being safe and effective for the treatment of PTSD, Plaintiff's physician(s) prescribed Neurontin to treat her PTSD on or around September 29, 1999. (Am. Compl. ¶ 32.)

• Plaintiff purchased and consumed Neurontin, as recommended and prescribed by her physician and in dosages prescribed, in an effort to control her PTSD. (Am. Compl. ¶ 33.)

• By reason of Plaintiff's consumption of Neurontin in a manner and at a dosage prescribed by her physician in an effort to treat her PTSD, on October 19, 2002 and May 5, 2003, Plaintiff attempted suicide. (Am. Compl. ¶ 33.)

• As a result of consuming Neurontin, Plaintiff suffered adverse effects, including, but not limited to, depression, insomnia, agitation, hyper-mania, vertigo-like symptoms, pneumonia, dehydration, loss of concentration, obesity, abdominal pains, diarrhea, leg spasms and occasional immobile legs, anxiety attacks, incorrect diagnosis and treatment of bipolar disorder, irritable bowel syndrom, mood swings and hostility, and impulsive and reckless behavior. She also suffered economic damages and losses. (Am. Compl. ¶¶ 37-38.)

• The injuries Plaintiff sustained were caused by or were contributed to by Plaintiff's consumption of Neurontin at a dosage prescribed by her physician for the treatment of PTSD in a manner consistent with the direct and indirect

1   advertising, marketing and promoting of the drug for such off-
2   label use by Defendants. (Am. Compl. ¶ 39.)
3   •   Upon information and belief, the above-described culpable
4       conduct by Defendants was a proximate cause of the injuries
5       sustained by Plaintiff. (Am. Compl. ¶ 48.)

6       In response, Defendants argue that "[n]one of these paragraphs
7   allege specifically how Pfizer's alleged and generalized wrongful
8   conduct caused her specific (unnamed) doctor . . . to prescribe
9   Neurontin, and resulted in her injury, except in a conclusory
10  fashion and upon information and belief." (Defs.' Reply at 6.)
11  Thus, Defendants' counsel requests that each of Plaintiff's claim
12  be dismissed.

13      In this case, I have already determined that Plaintiff's
14  claims for common law fraud, RICO violations and unjust enrichment
15  should be dismissed.  Thus, with respect to those claims, I will
16  not address whether Plaintiff Amended Complaint adequately plead
17  causation.

18      As to Plaintiff's strict liability claim, Defendants rely
19  solely on the statement in *Crosswhite v. Jumpking, Inc.*, 411 F.
20  Supp. 2d 1228 (D. Or. 2006), that "the plaintiff in a strict
21  liability case is required to establish that such condition
22  proximately caused his injuries or damages." *Id.* at 1235.   In
23  Oregon, a product liability action is defined as "a civil action
24  brought against a manufacturer, distributer, seller or lessor of a
25  product for damages arising out of: (1) any design, inspection,
26  testing, manufacturing or other defect in a product; (2) any
27  failure to warn regarding a product; or (3) any failure to properly
28  instruct in the use of a product." *CrossWhite*, 411 F. Supp. 2d at

17 - FINDINGS AND RECOMMENDATIONS

1231 (quoting ORS 30.900(1)-(3)).  ORS 30.900 "embraces all
theories a plaintiff can claim in an action based on a product
defect," including claims based on theories of negligence, strict
liability, and breach of warranty. *CrossWhite*, 411 F. Supp. 2d at
1231 (citations omitted).

Under the ORS 30.900, Plaintiff's claims for negligence,
strict liability, and breach of warranty are properly considered
product liability claims. *See Phelps v. Wyeth, Inc.*, Civ. No.
6:09-cv-06168-TC, 2012 WL 1499343 (Apr. 24, 2012) (making similar
observations).  At the motion to dismiss stage, I must accept all
of Plaintiff's material factual allegations as true and view all
facts in the light most favorable to her.  When so viewed,
Plaintiff's Amended Complaint sets forth facts supporting plausible
product liability claims based on theories of negligence, strict
liability and breach of warranty.  Defendants' lone citation to
*CrossWhite* does not support a contrary conclusion.

In terms of Plaintiff's cause of action for violation of the
UTPA, I agree that Plaintiff's Amended Complaint fails to allege
any connection between Defendants' marketing or advertising
campaigns and Plaintiff's unnamed physicians' decision to prescribe
her Neurontin. *See Feitler v. Animation Celection, Inc.*, 170 Or.
App. 702, 708, 713 P.3d 1044 (2000) (noting that where the alleged
UTPA violations are affirmative misrepresentations, the causation
element requires proof of reliance-in-fact by the consumer).  As
Defendants' counsel points out, "Plaintiff does not identify a
single statement or misrepresentation by Defendants to which
Plaintiff or her prescribing physicians were even exposed, no less
relied upon, nor does she allege any facts regarding her healthcare

1  provider's decision to prescribe Neurontin." (Defs.' Mem. Supp. at

2  11.) Even accepting Plaintiff's allegations as true, Plaintiff has

3  failed to plead factual content that allows a reasonable inference

4  to be drawn that Defendants are liable for the misconduct alleged.

5  *Moss*, 572 F.3d at 969.

6  ### D.   Unjust Enrichment Claim

7  Plaintiff's seventh claim is a common law cause of action for

8  unjust enrichment. Defendants also argue Plaintiff's unjust

9  enrichment claim fails because, as discussed above, she cannot

10 establish fraud.  Plaintiff claims she has satisfied the pleading

11 requirements for an unjust enrichment claim by alleging that

12 Defendants "fraudulently" induced her to purchase Neurontin. (Pl.'s

13 Opp'n at 9.)

14 Oregon "unjust enrichment cases speak of a range of

15 circumstances that could be deemed wrongful, including mistake,

16 fraud, coercion, undue influence, duress, taking advantage of

17 weakness, and violation of a duty imposed by a confidential or

18 fiduciary relationship." *Tupper v. Roan*, 349 Or. 211, 223, 243 P.3d

19 50 (2010).  Because Plaintiff's unjust enrichment claim appears to

20 be grounded in fraud, I conclude it has not been adequately pled

21 under Rule 9(b) for the reasons stated above.

22 ### E.   Leave to Amend

23 To the extent the court granted Defendants' motion to dismiss,

24 Plaintiff has requested that I convert Defendants' motion to

25 dismiss into a motion for more definite statement under Rule 12(e),

26 or alternatively to grant her leave to amend.  The latter of these

27 two options is appropriate.

28

19 - FINDINGS AND RECOMMENDATIONS

1    In determining whether to grant a motion to amend, the court
2  should consider (1) bad faith, (2) undue delay, (3) prejudice to
3  the opposing party, (4) futility of amendment, and (5) prior
4  amendments to the pleading. *Sisseton-Wahpeton Sioux Tribe v. United
5  States*, 90 F.3d 351, 355-56 (9th Cir. 1996).  The Ninth Circuit has
6  made clear, however, that amendments should be granted with
7  "extreme liberality" in order to facilitate decision on the merits.
8  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

9    Here, I agree with Defendants' that Plaintiff should not be
10  permitted to replead her claims under RICO because any damage
11  incurred derives from her alleged personal injuries.  *See Moore*,
12  636 F. Supp. at 367 (noting that leave to amend would be an
13  exercise in futility where, as here, the plaintiff failed to
14  alleged a business or property injury under RICO). With respect to
15  Plaintiff's remaining claims, it is far from "clear that the
16  complaint cannot possibly be cured by allegation of additional
17  facts." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).
18  Considering Plaintiff's counsel's indication that further discovery
19  is necessary, and the Ninth Circuit's general policy to permit
20  amendment with "extreme liberality," Plaintiff's motion for leave
21  to file a Second Amended Complaint should be GRANTED.

22                        *IV.  CONCLUSION*

23    For the foregoing reasons, Defendants' motion (Docket No. 47)
24  to dismiss Plaintiff's Amended Complaint should be GRANTED in part
25  and DENIED in part.  Plaintiff's sixth claim for relief based on
26  violations of RICO should be dismissed with prejudice.  Plaintiff's
27  causes of action for violations of UTPA, common law fraud and
28  unjust enrichment should be dismissed with thirty days leave to

20 - FINDINGS AND RECOMMENDATIONS

1  amend.    The   thirty   days   should   not   begin   to   run   until

2  pharmaceutical   representative   Tina   Marie   Thompson   is   deposed,

3  which,  according  to  counsel,  will  take  place  after  the  District

4  Judge  rules  on  this  pending  motion.   Plaintiff's  product  liability

5  claims  based  on  theories  of  breach  of  warranty,  negligence  and

6  strict  liability  should  survive  Defendants'  motion  to  dismiss.

7                              *V.   SCHEDULING ORDER*

8         The  Findings  and  Recommendation  will  be  referred  to  a  District

9  Judge.    Objections,  if  any,  are  due  **July  16,  2012.**    If  no

10  objections  are  filed,  then  the  Findings  and  Recommendation  will  go

11  under  advisement  on  that  date.   If  objections  are  filed,  then  a

12  response  is  due  **August 2, 2012.** When  the  response  is  due  or  filed,

13  whichever  date  is  earlier,  the  Findings  and  Recommendation  will  go

14  under  advisement.

15         Dated  this  27th  day  of  June,  2012.

16                              /s/ Dennis J. Hubel

17                              _____

18                                 Dennis James Hubel
                                Unites States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

21 - FINDINGS AND RECOMMENDATIONS